William G. OSBORNE,
Plaintiff–Appellee,

v.

DISTRICT ATTORNEY'S OFFICE FOR the THIRD JUDICIAL DISTRICT; Adrienne Bachman,* District Attorney, Defendants–Appellants.

No. 06–35875.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 10, 2007.

Filed April 2, 2008.

---

* Adrienne Bachman is substituted for former District Attorney Susan A. Parkes as appellant pursuant to Fed. R.App. P. 43(c)(2).

1120

Nancy R. Simel, Assistant Attorney General, Anchorage, AK, for defendant-appellant.

Peter J. Neufeld and Colin Starger, Innocence Project, Benjamin N. Cardozo School of Law, New York, NY; Randall S. Cavanaugh, Kalamarides & Lambert, Anchorage, AK; and Robert C. Bundy, Dorsey & Whitney LLP, Anchorage, AK, for plaintiff-appellee.

Before: ALFRED T. GOODWIN, MELVIN BRUNETTI, and W. FLETCHER, Circuit Judges.

BRUNETTI, Circuit Judge:

William Osborne, an Alaska prisoner, brought this action under 42 U.S.C. § 1983 to compel the District Attorney's Office in Anchorage to allow him post-conviction access to biological evidence—semen from a used condom and two hairs—that was used to convict him in 1994 of kidnapping and sexual assault. Osborne, who maintains his factual innocence, intends to subject the evidence, at his expense, to STR and mitochondrial DNA testing, methods that were unavailable at the time of his trial and are capable of conclusively excluding him as the source of the DNA.

In a prior appeal, *Osborne v. District Attorney's Office*, 423 F.3d 1050, 1056 (9th Cir.2005) (hereinafter *Osborne I* ),[1] we held that *Heck v. Humphrey* does not bar Osborne's § 1983 action because, even if successful, it will not necessarily demonstrate the invalidity of his conviction. We also remanded for the district court to address in the first instance whether the denial of access to the evidence violates Osborne's federally protected rights.

In this post-remand appeal, we affirm the judgment of the district court that, under the unique and specific facts of this case and assuming the availability of the evidence in question, Osborne has a limited due process right of access to the evidence for purposes of post-conviction DNA testing, which might either confirm his guilt or provide strong evidence upon which he may seek post-conviction relief.

## I

### A

Following a March 1994 jury trial in Alaska Superior Court, Osborne was convicted of kidnapping, assault, and sexual assault, and was sentenced to 26 years imprisonment, with 5 years suspended. The charges arose from a March 1993 incident in which the victim, a female prostitute named K.G., after agreeing to perform fellatio on two male clients, was driven to a secluded area of Anchorage and brutally attacked. *See generally Jackson v. State*, Nos. A–5276, A–5329, 1996 WL 33686444, at *1 (Alaska Ct.App. Feb.7, 1996) (consolidated direct appeal).

At gunpoint, K.G. was forced to perform fellatio on the driver while the passenger vaginally penetrated her with his finger and penis. The driver did not wear a condom, but the passenger wore a blue condom that K.G. had brought with her. When K.G. later refused their orders to get out of the car, the driver hit K.G. in the head with the gun, and at the driver's urging the passenger choked her. K.G. eventually attempted to flee, but her attackers pursued and beat her with an axe handle. As she lay in the snow in the fetal position and played dead, she heard the gun fire and felt a bullet graze her head. Though she could not see her attackers' faces, judging from their pants and footwear she believed it was the passenger who shot her. The attackers then partially covered K.G. with snow and fled in the car, leaving her for dead.

K.G. heard the car drive away but continued to lie under the snow until she was sure her attackers had gone. She then got up, walked to the main road, flagged down a passing car, told its occupants what had happened, and—hoping to avoid the police—asked only for a ride home. The following day, however, a neighbor of one of the car's occupants notified the police, who contacted K.G. Though initially uncooperative, K.G. eventually described the incident.

K.G. underwent a physical examination, during which hair and blood samples were collected. A vaginal examination was not performed, however, because the passenger-rapist had worn a condom and K.G. had bathed repeatedly since the attack. At the crime scene, Anchorage Police recovered from the snow a used blue condom, part of a condom wrapper, a spent shell casing, and two pairs of K.G.'s grey knit pants stained with blood. The blue condom and shell casing were found "very near" each other and in close proximity to bloody patches of snow and the disturbed berm of snow where K.G. had been partial-

---

1. There are three prior *"Osborne"* appellate opinions, one by this court and two by the Alaska Court of Appeals. The two state opin-ions are both titled *Osborne v. State* and will be referred to as *State I* and *II*.

ly buried. A layer of new snow, which had fallen the morning after the attack, aided the police in distinguishing between tire tracks made the night before by the assailants' car and tracks made the following day by two known vehicles. Those cars were owned by K.G.'s rescuers and their neighbor, who had visited the crime scene the day after the incident before contacting the police.

A week later, military police stopped Dexter Jackson for a traffic infraction. When Jackson opened his glove box to retrieve his registration, the officer spotted a gun case, which proved to hold a .380 caliber pistol. A further search of the car revealed a box of ammunition and a pocketknife. Observing that Jackson, his car, and his passenger at the time (who was not Osborne) resembled composite sketches that had been circulated after the assault on K.G., the military police contacted the Anchorage Police, whom Jackson told that Osborne was his accomplice on the night of the assault.

K.G. later identified Jackson and Osborne from photographic arrays. In identifying Jackson's accomplice, K.G. indicated that Osborne's and another person's photos were the "most familiar" to her and Osborne was "most likely" to have been the passenger who raped and shot her. K.G. also identified Jackson's car, and the police matched tire tracks at the crime scene to Jackson's car. K.G. also identified the pocketknife found in Jackson's car as hers, and ballistics tied the spent shell casing found at the crime scene to Jackson's pistol.

The State's crime lab subjected sperm found in the used condom to "DQ Alpha" DNA testing, which, similar to ABO blood typing, reveals the alleles present at a single genetic locus. The results excluded K.G., Jackson, and James Hunter (presumably Jackson's passenger when he was arrested), and showed that the sperm had the same DQ Alpha type as Osborne. That same DQ Alpha type is shared, however, by 14.7 to 16 percent of African Americans and thus can be expected in one of every 6 or 7 black men.

A DNA testing method called "RFLP," which was relatively more discriminating than DQ Alpha typing but, according to the State, "not quite as discriminating as the testing [Osborne] now seeks to conduct," was also available pre-trial but was not conducted on the sperm.[2] The State's crime lab expert considered sending out the sample for more discriminating testing, which was then available through the FBI, but did not because, at least at that time, more discriminating testing required a better quality sample than was provided in the condom and the expert "felt that the sample was degraded." Defense counsel also considered and rejected the option.

Counsel met with the DNA expert from the State crime lab, reviewed DNA research articles, and conferred with a Fairbanks public defender who was litigating the scientific basis of DNA testing. But defense counsel's explanation for not pur-

2. The State's concessions that the RFLP DNA testing available pre-trial is "not quite as discriminating as" the STR and mitochondrial DNA testing Osborne now seeks, and that these methods were not available pre-trial, is an apparent reversal of the State's representation to the state court that "the DNA testing that Osborne proposes to perform on this evidence existed at the time of Osborne's trial, and ... Osborne's trial attorney was aware of

this and consciously chose not to seek more specific testing." *Osborne v. State*, 110 P.3d 986, 992 (Alaska Ct.App.2005). According to the Superior Court's dismissal order that was on appeal in that case, Osborne's state claims involved (1) ineffective assistance at trial based on counsel's failure to pursue "RFLP" testing, and (2) a request for post-conviction "mitochondrial DNA" testing.

suing pre-trial RFLP testing differs from the State's expert's reasons. According to her post-conviction affidavit, counsel disbelieved Osborne's statement that he did not commit the crime, was concerned about a more inculpatory result nullifying Osborne's misidentification defense, and concluded that "Osborne was in a strategically better position without RFLP DNA testing," especially given the inherent uncertainty in the DQ Alpha results.

The police also recovered two pubic hairs: one from the used blue condom, and a second from K.G.'s sweatshirt, which she had lain on top of during the sexual assault. DQ Alpha typing of these hairs was unsuccessful, likely because the sample was too small for analysis. Based on microscopic analysis, however, the State's expert opined that both hairs were "dissimilar" to Jackson and Hunter but were "consistent" with having come from Osborne because they "exhibited the same microscopic features" as Osborne's pubic hair sample. Additional hairs having "negroid features" were also found on K.G.'s clothing but were inconsistent with any of the suspects investigated by police.

Osborne and Jackson were tried jointly before a jury. Osborne presented alibi and mistaken identity defenses, specifically arguing that there was too little time for him to have participated in the crime and pointing out flaws in K.G.'s identification. K.G. was not wearing her glasses on the night of the attack. She described the passenger who attacked her as black, between 25 to 30 years old, 6 feet tall, weighing 180–190 pounds, clean shaven, having his hair shaved on the sides and longer on top, and not wearing any jewelry. Osborne actually was 20 years old, weighed 155 pounds, and had a mustache. K.G.'s identification of Osborne was also cross-racial, Osborne being black and K.G. being white. Nonetheless, at trial K.G. pointed to Osborne and identified him as the passenger who attacked her.

Besides the biological and victim-eyewitness testimony, there was also circumstantial evidence of Osborne's culpability. Paper tickets from the Space Station arcade, where Osborne had been before the crime, were found in Jackson's car. One group of witnesses saw Osborne get into Jackson's car before the time of the crime, and another group saw Osborne with Jackson after the crime and reported seeing blood on Osborne's clothing. Apparently, no trace evidence of blood on Osborne's clothing was admitted at trial, however.

The jury rejected Osborne's mistaken identity and alibi defenses and convicted him of kidnapping, first-degree assault, and two counts of first-degree sexual assault, although he was acquitted of two counts of attempted first-degree murder and one count of sexual assault. On direct appeal, the Alaska Court of Appeals rejected Osborne's insufficient evidence claim and his other challenges and affirmed his conviction. *Jackson*, 1996 WL 33686444, at *7–8. Osborne did not seek direct review in the Alaska Supreme Court.

**B**

Osborne next filed an application for post-conviction relief in Alaska Superior Court, arguing first that his trial counsel was ineffective for failing to pursue RFLP testing, which was a potentially more precise type of DNA testing and was available at the time; and second that he has a due process right, under either the state or federal constitution, to have evidence re-tested using DNA testing methods that were not available until after his trial. In June 2002, the Superior Court denied his application. Osborne not only appealed that decision to the Alaska Court of Appeals, he also subsequently filed the under-

lying § 1983 action in federal district court.

While his state appeal and federal action were pending, in April 2004 Osborne also applied for discretionary parole with the Alaska Board of Parole. In his written application, Osborne confessed to participating in the attack on K.G. and described his actions in detail. He also confessed at his August 2005 hearing before the Parole Board and stated that he had told his mother and lawyer the truth about the incident. But despite his efforts at accepting responsibility, Osborne was denied parole.

Osborne also lost his state appeal. In reviewing the Superior Court's dismissal of Osborne's petition for post-conviction relief, the Alaska Court of Appeals affirmed in part, remanded in part for further proceedings, and retained jurisdiction in the interim. *Osborne v. State*, 110 P.3d 986, 995–96 (Alaska Ct.App.2005) (hereinafter *State I* ). The court rejected Osborne's ineffective assistance claim, holding that he failed to establish deficient performance. Like the Superior Court, the Court of Appeals noted that trial counsel "researched and considered" RFLP DNA testing, but decided against it for fear that a more discriminating test would further inculpate Osborne. That decision, the court concluded, was a "tactical" one that fell within the permissible range of attorney competence. *Id.* at 991–92. The court made no mention of the State's DNA expert's trial testimony that the sperm sample was too degraded to even permit RFLP testing.

As to Osborne's due process claim, the Court of Appeals initially observed that a prisoner "apparently" has no federal due process right to present new post-conviction evidence to establish a freestanding claim of factual innocence, absent an underlying constitutional defect at trial. *Id.* at 993, 995. "[A]s a matter of Alaska constitutional law," however, the court was "reluctant to hold that Alaska law offers no remedy to defendants who could prove their factual innocence," and it adopted a three-part test, which had been adopted by several other states, for cases in which defendants seek post-conviction DNA testing. *Id.* at 995. The court therefore remanded to the Superior Court for the limited purpose of determining whether Osborne could satisfy the test and, if so, whether Osborne's claim was otherwise procedurally barred under Alaska law. *Id.*

The remand proceedings in Alaska Superior Court were still pending when we decided *Osborne I* in September 2005. Eight months later, the Alaska Superior Court held that Osborne failed to satisfy the three factors set forth by the Alaska Court of Appeals in *State I* and therefore denied Osborne's request for DNA testing. The Superior Count found that (1) "Osborne's conviction did not rest primarily upon eyewitness identification evidence," (2) "no ... demonstrable doubt as to Mr. Osborne's identification[as the perpetrator] has been established," and (3) "[e]ven assuming that the DNA of either the pubic hair or the semen was tested and found not to be Mr. Osborne's, ... such evidence, if obtained, would not be conclusively exculpatory."

In *Osborne v. State*, 163 P.3d 973, 979–81 (Alaska Ct.App.2007) (hereinafter *State II* ), the Alaska Court of Appeals affirmed those three findings and the Superior Court's underlying factual findings and reasoning. Although Osborne subsequently filed a petition for review in the Alaska Supreme Court, which was pending when we heard oral argument in this case, that petition has since been denied. *Osborne v. State*, No. S–12799 (Alaska Jan. 22, 2008).

## C

In June 2003—one year after the Alaska Superior Court first denied Osborne's state petition for post-conviction relief, and one year before Osborne filed his application for discretionary parole in which he provided his written confession—Osborne filed the underlying action under 42 U.S.C. § 1983 alleging that the Anchorage District Attorney's Office, then-District Attorney Susan Parkes, the Anchorage Police Department, and then-Chief of Police Walt Monegan violated his rights under the United States Constitution by denying him post-conviction access to evidence for DNA testing. Specifically, he alleges violations of: (1) his due process right to access exculpatory evidence; (2) his due process right to demonstrate actual innocence; (3) his Eighth Amendment right to be free from cruel and unusual punishment; (4) his right to a fair clemency hearing; (5) his Sixth Amendment rights to confrontation and compulsory process; and (6) his due process and equal protection rights to meaningful access to the courts. He requests as a remedy "the release of the biological evidence"—the semen and pubic hair from the blue condom and the pubic hair from K.G.'s sweater—and "the transfer of such evidence for DNA testing."

Osborne's complaint explains that he intends to subject the evidence to two forms of DNA testing: Short Tandem Repeat ("STR") analysis and Mitochondrial DNA ("mtDNA") analysis. Unlike the DQ Alpha analysis used at trial, which looks to only one genetic locus, STR analysis examines the alleles at 13 genetic loci. Thus, it has the power to produce a far more specific genetic profile—one shared by one in a billion people, rather than one in 6 or 7. *See generally United States v. Kincade*, 379 F.3d 813, 818–19 (9th Cir.2004) (en banc) (discussing the science and accuracy of STR testing).

Moreover, if the DNA samples are unsuitable for STR analysis, Osborne intends to submit them to mtDNA analysis. STR analysis, like DQ Alpha analysis, examines DNA found in the nucleus, and is incapable of reaching a result from a hair sample unless the root or follicle is attached. By contrast, mtDNA analysis looks to DNA found in the mitochondria, and does not require the presence of a root or follicle. Osborne asserts that neither STR nor mtDNA analysis was available at trial and that he will have the testing performed at his expense.

In 2003, the State filed motions to dismiss Osborne's § 1983 action, arguing that Osborne's simultaneously pending state petition for post-conviction relief required federal court abstention under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and, alternatively, that under *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), Osborne's claims are not cognizable in a § 1983 action and may be brought only in a habeas proceeding. The district court granted the motion, holding that *Younger* abstention was inapplicable but that dismissal was required under *Heck* because Osborne sought to "set the stage" for an attack on his conviction.

Osborne appealed, and in *Osborne I* we reversed, holding that *Heck* does not bar a prisoner's § 1983 action seeking post-conviction access to biological evidence for purposes of DNA testing because, even if successful, the action will not necessarily demonstrate the invalidity of his conviction. *Osborne v. District Attorney's Office*, 423 F.3d 1050, 1056 (9th Cir.2005). We observed that "success would yield only *access* to the evidence—nothing more," "there is a significant chance that the results will either confirm or have no effect on the validity of Osborne's confinement" because "further DNA analysis may

prove exculpatory, inculpatory, or inconclusive," and "even if the results exonerate Osborne, a separate action—alleging a separate constitutional violation altogether—would be required to overturn his conviction." *Id.* at 1054–55. Expressing no opinion on the merits of Osborne's claims, we remanded to the district court to address in the first instance whether Osborne has been deprived of a federally protected right. *Id.* at 1056.

On remand, Osborne moved for summary judgment on his § 1983 claims. Days later, Osborne along with the Anchorage Police Department and Chief of Police Monegan filed a stipulation dismissing those two defendants in exchange for their withdrawal of opposition to Osborne's claim for DNA testing and their agreement to make the evidence available as required by any final court order or upon direction from the State of Alaska, Department of Law.

The remaining "State" defendants—the District Attorney and the District Attorney's Office—filed both an opposition to Osborne's summary judgment motion and a motion to stay proceedings based on the *Colorado River* and *Pullman* abstention doctrines. *See Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The district court denied the abstention motion, and the State has not appealed that denial.

Months later, and just days after the Alaska Superior Court issued its Findings on Remand from *State I,* the State filed a cross-motion for summary judgment. The State asserted, in addition to its arguments opposing Osborne's motion, that the Superior Court's factual findings were entitled to preclusive effect in federal court and otherwise support the State's position.

This time the district court ruled in Osborne's favor. *Osborne v. Dist. Attorney's Office,* 445 F.Supp.2d 1079 (D.Alaska 2006). After initially concluding that the Alaska Court of Appeals' decision in *State I* "is not binding upon this Court," the district court held that "there *does* exist, *under the unique and specific facts presented,* a very limited constitutional right to the testing sought." *Id.* at 1080–81 (citing *Harvey v. Horan (Harvey II),* 285 F.3d 298, 325 (4th Cir.2002) (Luttig, J., respecting the denial of rehearing en banc); *Thomas v. Goldsmith,* 979 F.2d 746, 749–50 (9th Cir.1992); and *Moore v. Lockyer,* No. 04–1952, 2005 WL 2334350, at *8, *9 (N.D.Cal. Sept.23, 2005)). The court continued:

> Significant to this conclusion is the fact that the testing sought was *not* available to Plaintiff ... at the time of trial, the fact that the testing sought can be easily performed without cost or prejudice to the Government, and the fact that the test results can either confirm Plaintiff's guilt or provide evidence upon which Plaintiff might seek a new trial. In this regard, and although the Court makes no findings as to whether Plaintiff would be entitled to a new trial, the Court concludes that a favorable result for Plaintiff might have a significant impact on a fact-finder[']s evaluation of guilt or innocence.
>
> The Court also concludes that equity and fundamental notions of fairness argue in favor of the relief Plaintiff seeks; especially, when considered in the appropriate context, e.g., the Government has no legitimate interest in punishing the innocent.
>
> The Court's conclusion in this matter assumes the availability of the evidence sought. If the evidence were no longer available, for any legitimate reason, there exists no right to test it and no

basis upon which Plaintiff could pursue the issue further.

*Id.* at 1081–82 (footnote omitted).

We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* the district court's rulings on cross-motions for summary judgment. *Phillips v. Hust,* 477 F.3d 1070, 1075 (9th Cir.2007). We also review *de novo* the legal question of whether there exists a post-conviction right of access to evidence for DNA testing. *Cf. id.* at 1079. Whether the State's refusal to grant access to evidence violates Osborne's constitutional due process right is also reviewed *de novo* as a mixed question of fact and law. *Cf. United States v. Duff,* 831 F.2d 176, 177 (9th Cir.1987).

## II

"It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Yet *Ritchie,* like the rest of the Supreme Court's cases involving *Brady* rights, involved only the right to *pre-trial* disclosure. *See id.* (citing *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), both of which involved only pre-trial suppression); *cf. id.* at 60, 107 S.Ct. 989 (describing the duty to disclose as "ongoing," yet simultaneously referencing only reconsideration of disclosure "as the proceedings progress" to ensure "the fairness of the trial"). The more novel question presented in this case is whether, and the extent to which, the Due Process Clause of the Fourteenth Amendment extends the government's duty to disclose (or the defendant's right of access) to *post-conviction* proceedings.

As both parties and the district court have recognized, this circuit's closest precedent is *Thomas v. Goldsmith,* 979 F.2d 746, 749–50 (9th Cir.1992), in which we ordered the disclosure of potentially-exculpatory semen evidence in a habeas corpus proceeding where testing of the evidence was potentially material to a so-called "gateway" showing of actual innocence. Rather than relying on general discovery principles or a pre-trial *Brady* right, we expressly applied *Brady* as a post-conviction right, stating:

> [W]e believe the state is under an obligation to come forward with any exculpatory semen evidence in its possession. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We do not refer to the state's past duty to turn over exculpatory evidence at trial, but to its present duty to turn over exculpatory evidence relevant to the instant habeas corpus proceeding.

*Thomas,* 979 F.2d at 749–50. Although the State contends that *Thomas* is distinguishable on a variety of grounds, we find none of those arguments persuasive and conclude that *Thomas* is controlling here despite the factual and procedural differences.

For instance, the State argues that *Thomas* involved pre-trial suppression in addition to post-conviction suppression, whereas Osborne had full pre-trial access to the biological evidence in question for purposes of DNA testing "using the best technology available at that time." Moreover, the State argues, in *Thomas* the petitioner claimed ineffective assistance based on trial counsel's failure to test the evidence, whereas the Alaska state courts have already rejected Osborne's similar ineffective assistance claim. But this is all rather beside the point given our reasoning in *Thomas.* It is patent in the above-quoted passage that in granting the petitioner a post-conviction right of access we expressly applied *Brady* as a post-trial

right and specifically disclaimed reliance on a pre-trial *Brady* violation or any other pre-trial violation. Pursuant to *Thomas,* the more material facts here are that the STR and mtDNA testing methods now being requested were in fact not accessible to Osborne pre-trial, whether due to suppression, ineffective assistance of counsel, or historical scientific limitations; such methods are far more discriminating than the testing methods that were available pre-trial, such that only now can Osborne be identified or excluded as the source of the DNA to a virtual certainty; and, for the same reasons, these newly available methods have the potential to provide strong evidence upon which Osborne might seek post-conviction relief. *Cf. Riofta v. State,* 134 Wash.App. 669, 142 P.3d 193, 200, 203 (2006) (distinguishing *Thomas* because Riofta had pre-trial access to the evidence and to testing "of equal accuracy" to that sought post-trial; also distinguishing a New Jersey case in which "DNA testing was not widely accepted and was expensive at the time of the ... defendant's trial").

At the time of briefing, the State further contended that the "Catch–22" that was present in *Thomas* does not exist here because Osborne had an alternative avenue for relief in state court, which he was at that time pursuing. As the Alaska Supreme Court has since denied Osborne's petition for review in *Osborne v. State,* No. S–12799 (Alaska Jan. 22, 2008), the State's argument is probably moot. But even if Osborne still had some available state remedy that he could pursue, the Catch–22 would remain. In both state and federal court the State has opposed Osborne's access-to-evidence claim based on the argument that Osborne cannot prove his actual innocence; yet Osborne needs access to the evidence to make that very showing. *Cf. Thomas,* 979 F.2d at 749. Although the State further contends that even assuming favorable test results Osborne

could not make a sufficient showing of actual innocence, that argument is out of place. The argument is certainly relevant to the ultimate question of whether, given the state of the evidentiary record, the requested DNA testing would be sufficiently material to require disclosure in this case. *See infra* Part IV. But the State's argument is irrelevant to the instant threshold issue of whether Osborne can even begin to invoke *Thomas* as establishing a post-conviction *Brady* right. Moreover, to the extent the existence of parallel state litigation might have raised abstention concerns, the State's motions to dismiss or stay proceedings based on *Younger, Colorado River,* and *Pullman* abstention were all denied by the district court, and the State failed to reassert its abstention arguments in either *Osborne I* or the instant appeal.

The State finally contends that *Thomas* is distinguishable because Osborne does not have an ongoing federal habeas action to which the requested DNA testing would be material. According to the State, such a limitation on *Thomas* is necessary to prevent *Brady* from applying "in the abstract and in perpetuity." We disagree and reject the notion that *Thomas'* recognition of a post-conviction *Brady* right is inapplicable per se in the absence of an ongoing habeas proceeding.

While recognizing that Osborne's sole purpose in bringing the underlying § 1983 action is to obtain post-conviction access to potentially exculpatory evidence and thereby "to 'facilitate' or 'set the stage' for a future attack on his conviction," in *Osborne I* we specifically rejected the State's position that a post-conviction access-to-evidence claim must be brought in habeas rather than under § 1983. 423 F.3d at 1055. Yet that would be the necessary consequence of the State's proposed limitation of *Thomas.* The purportedly mandato-

ry habeas action would render any § 1983 action for access to evidence superfluous, leaving the habeas action as the exclusive vehicle for asserting *Thomas* rights. Thus, the State's proposed limitation of *Thomas* does little more than rehash in different clothing the already rejected contentions that Osborne has failed to state a claim under § 1983 and "that a claim which *can* be brought in habeas *must* be brought in habeas." *Id.*

Furthermore, Osborne's access-to-evidence claim has been pursued without undue delay and is specifically intended to support an application for post-conviction relief. Osborne has declared in his § 1983 complaint his intention, once he obtains the requested DNA testing, to file a petition for post-conviction relief based on a "freestanding" claim of actual innocence— *i.e.*, despite the lack of any constitutional error at his trial, his incarceration is unconstitutional due to actual innocence— which Osborne might bring in either state or federal court.

Under Alaska law Osborne appears to have at least a potentially viable opportunity of bringing a freestanding actual innocence claim in a second or successive petition for post-conviction relief. However unfavorable the court's rejection of Osborne's first petition in *State II* may be, his state law options are not foreclosed entirely. In a concurrence, a two-judge majority stated that, regardless of any otherwise applicable procedural bars (presumably including those against successive petitions), the Alaska Constitution might require court intervention if a defendant were to present "clear genetic evidence of [his] innocence," and "[i]f Osborne could show that he were in fact innocent, it would be unconscionable to punish him." *State II,* 163 P.3d at 984–85 (Mannheimer, J., joined by Coats, C.J., concurring). Thus, despite the improbability of success on the merits given the court's findings

regarding the expected immateriality of the requested DNA testing, if Osborne's hunt for new evidence exceeds the state courts' expectations (which remains a possibility, *see infra* Part IV.B) his actual innocence claim might be cognizable under the authority of Judge Mannheimer's concurrence.

Federal law presents a similar opportunity. The State would take the position that a freestanding actual innocence claim is not cognizable under federal law; however, the State also concedes that it is presently an open question. In *Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court assumed without deciding that such a claim is possible. And in *House v. Bell,* 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), the Court again declined to resolve "the question left open in *Herrera* " in such a way as to suggest that it will remain unanswered until it is squarely presented by a petitioner actually making a persuasive showing of actual innocence. *Id.* at 554–55, 126 S.Ct. 2064 (concluding that "whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it"). The same might be said of the question of whether there should be a distinction between capital and non-capital cases, although *Herrera* did suggest equal treatment. *See Herrera,* 506 U.S. at 405, 113 S.Ct. 853 ("[W]e have 'refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas corpus.' " (quoting *Murray v. Giarratano,* 492 U.S. 1, 9, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (plurality opinion))).

■ In this circuit we not only have assumed that freestanding innocence claims are possible but also have articulated a minimum standard: "a habeas petitioner asserting a freestanding innocence

claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir.1997) (en banc); *see also Jackson v. Calderon,* 211 F.3d 1148, 1164–65 (9th Cir. 2000).

In resolving the instant appeal, we need not decide the open questions surrounding freestanding actual innocence claims. Instead, we assume for the sake of argument that such claims are cognizable in federal habeas proceedings in both capital and non-capital cases under the standard set forth in *Carriger.*

Such a claim is not yet before us; it would require the filing of "a separate action—alleging a separate constitutional violation altogether." *Osborne I,* 423 F.3d at 1055. Also, even where an actual innocence claim has been filed, *Herrera, House, Carriger,* and *Jackson* all support the practice of first resolving whether a petitioner has made an adequate evidentiary showing of actual innocence before reaching the constitutional question of whether freestanding innocence claims are cognizable in habeas. And under *Majoy v. Roe,* 296 F.3d 770 (9th Cir.2002), the testing of potentially exculpatory evidence may be given precedence over the consideration of even jurisdictional questions involving pure issues of law.

In *Majoy,* we held that the district court should first order that testing be conducted, hold an evidentiary hearing to permit full development of the facts supporting a "gateway" actual innocence claim under *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and determine whether that claim was factually meritorious, all before considering whether the claim was jurisdictionally barred. *Majoy,* 296 F.3d at 776–77. We reasoned that the issue of whether a gateway actual innocence claim provides a constitutional exception to AEDPA's statute of limitations

was such an "important legal question" that it "is not appropriately addressed by us in a hypothetical context," particularly given the " 'fact-intensive nature of this [actual innocence] inquiry, together with the District Court's ability to' " obtain the necessary evidence. *Id.* at 777 (quoting *Schlup,* 513 U.S. at 332, 115 S.Ct. 851). By extension, until Osborne has actually brought an actual innocence claim and has been given the opportunity to develop the facts supporting it, Osborne's access-to-evidence claim may proceed on the well-established assumption that his intended freestanding innocence claim will be cognizable in federal court.

There are two notable differences between the out-of-circuit and district court cases that do not recognize a post-conviction right of access to evidence and those that do. First, the former tend to conflate the right of access to evidence with the ultimate right to habeas relief. *See, e.g., State I,* 110 P.3d at 992, 993 (noting that Osborne claims a right of access to evidence, but analyzing whether *Herrera* permits a claim of actual innocence based on new evidence); *Harvey v. Horan (Harvey I ),* 278 F.3d 370, 375 (4th Cir.2002) (dismissing under *Heck ).* The latter distinguish the two actions. *See, e.g., Harvey v. Horan (Harvey II ),* 285 F.3d 298, 322–24 (4th Cir.2002) (Luttig, J., respecting the denial of rehearing en banc).

Second, courts denying a post-conviction right of access read *Brady* and its progeny as applying only as a trial right. *E.g., Grayson v. King,* 460 F.3d 1328, 1337, 1342 (11th Cir.2006) (ultimately limiting its holding to "the particular circumstances of this case"); *Harvey I,* 278 F.3d at 378–79. By contrast, courts recognizing a post-conviction right have done so not necessarily based on *Brady* itself but based on the due process principles that motivated *Brady,* including fundamental fairness, the prose-

cutor's obligation to do justice rather than simply obtain convictions, and the "constitutional imperatives of 'protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.'" *Wade v. Brady,* 460 F.Supp.2d 226, 246 (D.Mass.2006) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *see also Harvey II,* 285 F.3d at 316–18 (Luttig, J., respecting the denial of rehearing en banc); *Moore v. Lockyer,* 2005 WL 2334350, at *8 (N.D.Cal. Sept.23, 2005), *appeal docketed,* No. 06–15016 (9th Cir. argued Oct. 15, 2007).

This circuit has already staked out positions on both of these issues. In *Osborne I,* 423 F.3d at 1054–55, we drew a sharp distinction between access-to-evidence and habeas claims in holding that Osborne's access claim is not barred by *Heck v. Humphrey.* And in *Thomas,* 979 F.2d at 749–50, we expressly applied *Brady* as a post-conviction right in a habeas proceeding based on the requirements of fundamental fairness. Faced now with the argument that *Thomas* should be limited to cases with ongoing habeas petitions, we reject that view and hold that Osborne is entitled to assert in this § 1983 action the due process right to post-conviction access to potentially exculpatory DNA evidence that we recognized in *Thomas.*

### III

The State alternatively contends that, even if there is a post-conviction right of access, the scope of the right recognized by the district court is too broad. It proposes a narrower standard for judging the materiality of evidence favorable to Osborne. In the State's view, before it is obligated to disclose any evidence post-conviction, Osborne should be required to satisfy the extraordinarily high standard of proof that applies to freestanding claims of actual innocence. Thus, under our case law, Osborne would be required to "go

beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger,* 132 F.3d at 476; *see also Jackson,* 211 F.3d at 1164. We disagree.

The fundamental flaw in the State's position is that it effectively equates Osborne's access-to-evidence claim with a habeas claim. Under the State's conception, Osborne would have to satisfy the same actual innocence standard in order to merely obtain potentially exculpatory evidence as he would in order to actually overturn his conviction. The only difference is in the factual predicate: we would analyze Osborne's access claim taking into account the eventuality that further DNA testing will be favorable to Osborne, whereas habeas relief would require the actual results. The application of *Carriger's* legal standard, however, would otherwise be identical.

The State is getting ahead of itself. Obtaining post-conviction access to evidence is not habeas relief. And requiring Osborne to demonstrate that he would be entitled to habeas relief if the test results are favorable in order even to conduct such testing is fundamentally inconsistent with *Brady, Thomas,* and *Osborne I.* Under these authorities, the most stringent materiality standard for simply obtaining post-conviction access to evidence must be more lenient than the standard of proof Osborne will ultimately have to satisfy in order to obtain habeas relief.

While *Brady* ensures a fair trial, a defendant's right to pre-trial disclosure under *Brady* is not conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence were disclosed. Rather, disclosure is required if there is a "reasonable probability" of a more favorable result at trial, and "the adjective is important." *Kyles v. Whitley,* 514 U.S. 419, 434, 115

S.Ct. 1555, 131 L.Ed.2d 490 (1995). As the Supreme Court explained in *Kyles,* "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* Nor is it "a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35, 115 S.Ct. 1555. Instead, materiality for *Brady* purposes is established "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555.

In *Thomas,* we extended *Brady* as supporting a habeas petitioner's post-conviction right to obtain access to semen evidence for purposes of DNA testing. 979 F.2d at 749–50. While we did not expressly adopt *Brady*'s materiality standard for post-conviction access claims or otherwise define the applicable materiality standard, our decision was in general accordance with the principles underlying *Brady* materiality. Despite the fact that the petitioner ultimately needed the semen evidence in order to establish a *Schlup* "gateway" claim of actual innocence for purposes of overcoming a procedural default, we did not condition the petitioner's right of access on his ability to first demonstrate that favorable test results would in fact enable the petitioner to make a colorable showing of actual innocence. Instead, we merely noted that "[a] semen sample, or tests thereof, *might* enable him to make such a showing," "[i]n light of the obvious exculpatory *potential* of semen evidence in a sexual assault case." *Id.* at 749, 750 n. 2 (emphasis added). We put off analyzing the complete factual basis for petitioner's actual innocence claim until the evidence, if it even still existed, was actually produced and tested. *Id.* at 750.

Similarly, in *Jones v. Wood,* 114 F.3d 1002 (9th Cir.1997), we held that a habeas petitioner was statutorily entitled to post-conviction testing of physical evidence and other discovery because such "discovery is essential for Jones to *develop fully* his ineffective assistance of counsel claim," and "the test results *may* establish the prejudice required to make out such a claim." *Id.* at 1009 (emphasis added). And in *Majoy,* we found sufficient "the *distinct possibility* that given the opportunity, Majoy *may be able* to muster a *plausible* factual case meeting the exacting gateway standard [of actual innocence] established by the Supreme Court in *Schlup.*" 296 F.3d at 775 (emphasis added).

In *Osborne I,* we did not address the standards Osborne might have to satisfy in order to prevail on his access-to-evidence claim. But our decision that *Heck v. Humphrey* does not bar Osborne's § 1983 action was based on the rationale that Osborne's access-to-evidence claim is not the functional equivalent of a habeas petition because it would not necessarily demonstrate the invalidity of his conviction. Indeed, "a separate action—alleging a separate constitutional violation altogether—would be required to overturn his conviction." *Osborne I,* 423 F.3d at 1055. Nonetheless, rather than allow the objective facts to come to light so that Osborne can actually file his actual innocence claim and support it with hard evidence, the State effectively would have us fully analyze that same claim as a hypothetical by adopting the same habeas standard in the instant action. In accordance with the cases discussed above, we decline to do so.

For his part, Osborne contends that the ordinary pre-trial *Brady* materiality standard is the most appropriate standard for evaluating a prisoner's post-conviction right of access to evidence. Thus, he pro-

poses that we require only a reasonable probability that, had the evidence been disclosed to the defense, the result of his trial would have been different. *See Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555; *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

As it turns out, however, Osborne's case for disclosure is so strong on the facts that his proposed legal standard, which would give him the benefit of both the presumption of innocence and the requirement of jury unanimity for conviction, sets the bar far lower than what he is able to show in this case. Wherever the bar is, he crosses it. This case therefore does not require us to determine the full breadth of post-conviction *Brady* rights. The precise height at which the materiality bar should be set is largely an academic question, which we may leave to another day and another case that truly presses the issue. Resolving the instant case requires us to determine only that Osborne's showing of materiality is sufficient to require disclosure, and not whether the same due process right might be invoked upon a lesser showing.

 In accordance with that reservation and our analysis in rejecting the State's proposal as setting the bar too high, we hold that the standard of materiality applicable to Osborne's claim for post-conviction access to evidence is no higher than a reasonable probability that, if exculpatory DNA evidence were disclosed to Osborne, he could prevail in an action for post-conviction relief. Taking into account Osborne's declared intention to file a freestanding claim of actual innocence, materiality would be established by a reasonable probability that Osborne could "affirmatively prove that he is probably innocent." *Carriger,* 132 F.3d at 476. And to paraphrase the Supreme Court's definition of "reasonable probability," this materiality standard does not require a demonstration by a preponderance that

disclosure of the DNA evidence will ultimately enable Osborne to prove his innocence. *See Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. The question is not whether Osborne would more likely than not be granted habeas relief with the evidence, but whether in the absence of the DNA evidence Osborne would receive a fair habeas hearing, understood as a hearing resulting in a judgment "worthy of confidence." *Id.*

As discussed next, considered in light of the particular facts of this case, this standard is satisfied by the potential probative value of the DNA evidence to which Osborne seeks access.

## IV

### A

 As an initial matter, the State contends that in assessing the potential materiality of further DNA testing, this court should give preclusive effect to three factual findings made by the Alaska Superior Court, and later affirmed by the Alaska Court of Appeals in *State II,* when the court rejected Osborne's request for DNA testing under state law. Those findings are that (1) Osborne's conviction did not rest primarily on eyewitness identification evidence, (2) there was no demonstrable doubt concerning the accuracy of the victim's identification of Osborne as the perpetrator, and (3) additional DNA testing would not conclusively establish Osborne's innocence. *State II,* 163 P.3d at 978.

 Whether the state court's factual findings have preclusive effect in this federal proceeding is a mixed question of law and fact that we review *de novo. See Littlejohn v. United States,* 321 F.3d 915, 919 (9th Cir.2003). In § 1983 actions, we apply state law to determine the preclusive effect of a state court's findings. *Heck v. Humphrey,* 512 U.S. 477, 480 n. 2, 114

S.Ct. 2364, 129 L.Ed.2d 383 (1994). Under Alaska law, factual findings are entitled to preclusive effect if the party against whom estoppel is asserted was a party to or in privity with a party to the prior action, the issue to be precluded is identical to that decided in the first action, and the issue in the first action was resolved by a final judgment on the merits. *Holmberg v. State*, 796 P.2d 823, 827 (Alaska 1990). The parties here raise no dispute regarding the privity and final judgment requirements. They dispute only whether the issues decided by the Alaska courts are identical to the issues raised by Osborne's access-to-evidence claim under federal law.

██ The state court's first and second findings regarding the evidence supporting Osborne's identification as the perpetrator are certainly relevant to our inquiry, but only insofar as such evidence is part of the broader evidentiary backdrop against which the materiality of exculpatory DNA tests is to be analyzed. The state court's findings fundamentally differ from our materiality inquiry, however, in that they are exclusively historical, focusing only on the state of the evidence as it existed at trial and whether that trial record would lead one to question the integrity of that evidence, much like a sufficiency of the evidence inquiry under *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). By contrast, the materiality of suppressed evidence and the viability of an actual innocence claim based on new evidence are far more comprehen-

sive and forward-looking inquiries that do not "turn on discrete findings regarding disputed points of fact." *House*, 547 U.S. at 539–40, 126 S.Ct. 2064. "One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded [or was inherently flawed], but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence" in a decision made without the evidence. *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. In assessing whether DNA results favorable to Osborne would be material to an actual innocence claim, we "must consider all the evidence, old and new, incriminating and exculpatory," and "make a probabilistic determination about what [a reasonable factfinder] would do." *House*, 547 U.S. at 538, 126 S.Ct. 2064 (internal quotation marks omitted).

Thus, only the state court's third finding—which is essentially its "materiality" finding under Alaska law—is in play here. But that finding is also not entitled to preclusive effect in this case because it was made in conformity with a materiality standard under state law that is more stringent than any standard this court would apply under federal law. Whereas the Alaska courts inquired as to whether DNA tests excluding Osborne as the source of the genetic material would "*conclusively* establish Osborne's innocence," *State II*, 163 P.3d at 981 (emphasis added),[3] we have determined that materiality

---

**3.** The Alaska Court of Appeals originally phrased the broader issue under Alaska law as "whether further DNA testing ... would *likely* be conclusive on the issue of Osborne's guilt or innocence." *State II*, 163 P.3d at 980 (emphasis added). But that inquiry undergoes a significant metamorphosis as the opinion progresses. After the court acknowledges that further DNA testing could produce three different results—inculpatory, inconclusive, or exculpatory—from that point forward the court presumes test results favorable to Os-

borne and the word "likely" disappears from its statement of the legal standard. *Id.* Thus, the inquiry ultimately becomes: "assuming that this third alternative came to pass—*i.e.,* assuming that a more discriminating DNA test showed that the genetic material did not come from Osborne—would this test result be conclusive evidence of Osborne's innocence?" *Id.* Moreover, even if we have misread or were to ignore this shift, we would reach the same result. First, it is unclear whether

under federal law requires Osborne to demonstrate, at most, only a *reasonable probability* that with favorable DNA test results he could affirmatively prove that he is *probably* innocent. *Cf. House,* 547 U.S. at 538, 553–54, 126 S.Ct. 2064 (holding that, although there was not "conclusive exoneration," the petitioner satisfied the *Schlup* standard for a gateway claim of actual innocence—"that more likely than not, in light of the new evidence, . . . any reasonable juror would have reasonable doubt"). Indeed, Alaska's materiality standard for merely obtaining post-conviction access to evidence is more stringent than even this circuit's standard for obtaining habeas relief based on a freestanding claim of actual innocence. *Compare State II,* 163 P.3d at 981 ("conclusively establish Osborne's innocence"), *with Carriger,* 132 F.3d at 476 ("affirmatively prove that he is probably innocent"). We therefore afford the state court's findings no preclusive effect in determining whether the evidence in question is sufficiently material to require disclosure by the State.

**B**

■ The State contends that even DNA test results excluding Osborne as the source of the semen and pubic hair from the blue condom and the pubic hair from K.G.'s sweater would not cast sufficient doubt on his conviction to require disclosure of that evidence. In the State's view, notwithstanding the prosecution's reliance on such biological evidence in obtaining Osborne's conviction, the evidence actually might be entirely unrelated to the rape and therefore immaterial to Osborne's claim of innocence.

Regarding the semen and pubic hair from the blue condom, the State acknowledges that the condom was recovered at the crime scene, that expert testimony was presented at trial comparing Osborne's hair to the pubic hair from the condom and matching Osborne's DQ Alpha type to that of the sperm from the condom, which placed Osborne within 14.7 to 16 percent of the black population sharing that type, and that in the prosecution's closing argument it specifically relied on the combination of this genetic evidence as proof of Osborne's guilt. Nonetheless, considering the possibility that more precise DNA tests might conclusively establish that Osborne did not use the blue condom, the State now argues that such evidence was "not the sole basis for finding Osborne guilty" in that there was circumstantial evidence placing Osborne with Jackson on the night in question and K.G. identified Osborne as the passenger-rapist. Moreover, the State argues, "[o]ther conclusions about the donor of the DNA in the sperm and the hair associated with the condom were plausible and equally reconcilable with Osborne's guilt." Based on the fact that the condom was recovered by the police more than twenty-four hours after the assault and, according to the State's characterization, "in a semi-secluded area on the outskirts of Anchorage that was convenient for conducting sexual trysts," the State now proposes three possible scenarios for how Osborne could be guilty despite exculpatory DNA tests. First, the blue condom could have been discarded at the crime scene by persons unrelated to Jackson and Osborne either before K.G.'s attack or after the attack but before the police searched the area. Second, the blue condom could have been used at an earlier time by another individual, left in Jackson's car, and discarded or dropped at the crime scene by Jackson and Osborne. Or third, trace biological material—particularly the pubic

"likely" equates to "reasonable probability" within the meaning of *Bagley* and *Kyles.* And second, a freestanding actual innocence claim

under *Carriger* requires only an affirmative showing of probable innocence, not conclusive proof.

hair found on the outside of the condom—could have been transferred to the condom from another surface after its use.

The State makes a similar argument regarding the pubic hair that was found on K.G.'s sweater. According to the State, the fact that K.G. was working as a prostitute, the propensity hairs have for transference, and the ability of K.G.'s knitted acrylic sweater to hold a hair all point to the possibility that it might be anyone's pubic hair, and not necessarily her attacker's. Thus, despite the fact that at Osborne's trial the prosecution argued that "we know that the person that did this had contact with [K.G.'s] sweater" because "[t]here's a pubic hair on it," the State now argues that it has never been established that the pubic hair was from one of the assailants and that it "could have originated from any person who had ever been near K.G. or from any person who had ever been in Jackson's car" prior to the rape.

On their face, the State's hypotheticals are not beyond the bounds of reason. But that is not the applicable federal standard for determining the materiality of evidence that is favorable to the accused, notwithstanding the Alaska Court of Appeals' interpretation of Alaska law. *Cf. State II,* 163 P.3d at 980–81 (concluding that further DNA testing "would not conclusively establish Osborne's innocence," based in part on the reasoning that the blue condom "might have been coincidentally left in the vicinity by another person before the police arrived"). Those hypotheticals must be assessed in light of the entire record. And in that regard, although the State points to the circumstantial and eyewitness evidence that is supportive of the prosecution's case at trial and Osborne's conviction, the State fails to point to any *evidence in the record* that would affirmatively support its newly imagined alternative theories of the crime and accordingly

rebut its own presentation at trial regarding the significance of the biological evidence as positively identifying the real perpetrator. *Cf. House,* 547 U.S. at 547, 126 S.Ct. 2064 (noting the lack of evidence "in the present record" rebutting the new evidence supporting petitioner's actual innocence claim). The State's hypotheticals are formulated based on nothing more than the very uncertainties that necessarily arise where new evidence upsets accepted notions of reality and forces a fundamental reassessment of the factual record. Even worse, they fail to account for evidence already in the record that seriously calls into question whether the State's hypotheticals might have any basis in reality. *Cf. id.* at 546, 126 S.Ct. 2064 ("This should be a matter for the trier of fact to consider in the first instance, but we can note a line of argument that could refute the State's position.").

The trial record reveals that the attack occurred down a service road, which was located in an isolated area on the outskirts of Anchorage off Point Woronzof Drive and near Earthquake Park. Although the State characterizes it as a "semi-secluded" location that was "convenient for conducting sexual trysts," which is apparently why the perpetrators chose the location, there does not appear to be any evidence in the record indicating that the location was ever used for such a purpose by any other persons on that night or the following day, or for that matter any other day. To the contrary, the evidence presented at trial seems to indicate that no one else had been down that service road, either by car or on foot, around the time of the crime. There was already snow on the ground before the attack, and a layer of new snow fell by the next morning. Judging by the tracks in the snow, only a few known individuals visited the area at the end of the service road both on the night of the assault and the next day. Even though

the police did not arrive until twenty-four hours after the attack, they found only a few sets of footprints and tire tracks. The police made castings of some of the show prints in the snow, but those were matched to K.G.'s rescuers and their neighbor and were therefore eliminated as suspect prints. Similarly, the trial record indicates the police found only three sets of tire tracks, all of which were later matched to known vehicles—those owned by Jackson, K.G.'s rescuers, and their neighbor. Because of the old and new snow layers, the police were even able to distinguish each of the three sets of tracks by the time periods in which they were made. The tracks from Jackson's car were in a lower layer of snow, while the two other sets were fresh. This was due to the fact that K.G. had walked to the main road before being picked up, and her rescuers and their neighbor did not visit the crime scene until the following day after the new snow had fallen. Significantly, the trial record does not indicate the existence of any other tire tracks or shoe prints that might have indicated that some unknown, innocent person visited the scene either before or after the attack.

Additional record evidence also tends to contradict the notion that the blue condom could be attributable to someone other than Jackson's accomplice. The trial record indicates that the police recovered no condoms from Jackson's car, they recovered only one condom and part of a blue foil condom wrapper from the crime scene, and the color and size of the blue condom and the color of the wrapper were the same as that of the condom and wrapper that K.G. had with her that night. K.G. also testified that she thought the condom was the same one that she had with her and that Jackson's passenger wore during the rape. The police found the condom "at point C in the snow" right beside some blood and part of the blue and gold foil wrapper matching the condom K.G. was

carrying, and it was also very near the spent shell casing from Jackson's gun, K.G.'s bloody pants, the disturbed berm of snow in which K.G. had been partially buried, and the tire tracks from Jackson's car, probably on the passenger side where Jackson's accomplice would have been. Thus, the condom was found not merely in the vicinity of the crime scene but in the *exact* location where K.G. was attacked. Regarding the timing, although the police did not search the crime scene until twenty-four hours after the rape, K.G.'s rescuers reported seeing the condom lying in the snow when they visited the crime scene around noon on the day after the attack. Thus, the time frame in which the condom could have been left there was far narrower than the State suggests. Finally, a crime lab technician testified that when he received the condom, which by then had been packaged in a closed plastic cup, the condom was rolled down and there was still a substantial amount of semen inside that had not yet dried. Taken together, these facts are far more consistent with the prosecution's trial narrative—that Jackson's passenger used K.G.'s condom during the rape, he removed and discarded it at the scene, and it remained undisturbed in the snow until it was recovered by the police—than any of the State's newly proposed alternative explanations for the condom's origin.

The State also fails to recognize that further DNA testing is *alone* capable of establishing the supposedly missing link between the condom and K.G.'s rape. The potential probative value of the semen and pubic hair from the blue condom and the pubic hair from K.G.'s sweater must be considered collectively, not in isolation as the State has considered the evidence. *See Kyles,* 514 U.S. at 436, 115 S.Ct. 1555 (explaining that materiality is defined "in terms of suppressed evidence considered collectively, not item by item"); *House,*

547 U.S. at 538, 126 S.Ct. 2064 ("*Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory" (internal quotation marks omitted)); *see, e.g., id.* at 552–53, 126 S.Ct. 2064 ("If considered in isolation, a reasonable jury might well disregard it. In combination, however, ... the evidence ... likely would reinforce other doubts as to House's guilt."). As the State itself should expect given the prosecutor's trial presentation and its continued belief in Osborne's guilt, further DNA testing could establish a genetic match between the semen and pubic hair on the condom and the pubic hair on K.G.'s sweater, proving that the user of the condom was also in such contact with K.G. as to transfer a pubic hair to her sweater. As the prosecutor argued at trial, because the sweater was spread out underneath K.G. during the rape, the most likely scenario is that the hair was transferred by Jackson's accomplice at that time.

Moreover, further DNA testing might even directly link the blue condom to K.G. herself. Although we have mainly focused on the semen and hair evidence that we know to exist, the trial record reveals that epithelial cells were found on the outside of the condom. Based on this evidence, the prosecution argued at trial that it indicates how the condom was used because epithelial cells come from only the inside of the mouth, rectum or vagina. Further DNA testing might be able to go one step further and genetically match any such trace material from the condom to K.G., conclusively establishing that the condom was used in K.G.'s rape and disproving any of the State's new hypotheses.

New evidence favorable to Osborne could also lead to new lines of investigation and additional new evidence. *See People v. Garcia,* 17 Cal.App.4th 1169, 22 Cal. Rptr.2d 545, 551 (1993); *see also Bagley,* 473 U.S. at 683, 105 S.Ct. 3375 ("[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case."). Based on the State's obstinate denial that Osborne might be innocent even if DNA test results exclude him as a source of the biological evidence used to convict him, the State would seem intent on developing a case to continue to fight Osborne's claim of innocence. But such an investigation might instead lead in the opposite direction and further solidify Osborne's case for innocence. As Osborne contends, if the STR DNA test results exclude him, those results could then be placed into the state and national DNA databank system, which did not exist when Osborne was tried, and possibly identify the real perpetrator. *See State I,* 110 P.3d at 992 n. 14 (noting that Alaska maintains a DNA registry).

In summary, the State's proposed hypotheticals for reconciling exculpatory DNA tests with Osborne's guilt are so inconsistent with and improbable in light of the evidence in the trial record that they cannot negate the materiality of further DNA testing to possible post-conviction relief. *Cf. House,* 547 U.S. at 553–54, 126 S.Ct. 2064 (holding that, although there was not "conclusive exoneration," the petitioner satisfied the *Schlup* actual innocence standard). "In light of the obvious exculpatory potential of semen evidence in a sexual assault case," *Thomas,* 979 F.2d at 750 n. 2, and given the evidentiary record in this sexual assault case and the unique circumstances of this crime, we have no difficulty concluding that DNA tests favorable to Osborne would have extraordinary exculpatory potential and would be material to proving his actual innocence. At the very least, exculpatory DNA tests would entitle Osborne to an evidentiary hearing on his actual innocence claim in order to more fully develop the factual record and recon-

cile any conflicting evidence. *See Cooper v. Woodford,* 358 F.3d 1117, 1123–24 (9th Cir.2004) (en banc); *cf. House,* 547 U.S. at 537, 126 S.Ct. 2064 (addressing the merits of a *Schlup* gateway claim "based on a fully developed record").

### C

■ Thus far we have limited our analysis to the evidence in the trial record and the evidence that might be discovered if the State were forced to allow it to come to light. But the State also points to Osborne's written confession in his application for parole and his oral confession at his subsequent parole hearing as foreclosing his right to obtain post-conviction access.

The confessions are certainly relevant to our inquiry. Because Osborne's ultimate claim for post-conviction relief will be actual innocence rather than mere trial error, all new evidence may be considered in assessing the potential materiality of further DNA testing. *See House,* 547 U.S. at 538, 126 S.Ct. 2064 ("all the evidence, old and new, incriminating and exculpatory, without regard to … admissibility … at trial" (internal quotation marks omitted)). No doubt, that includes Osborne's written and oral confessions to the state parole board. *See State II,* 163 P.3d at 978–79.

We disagree, however, that the confessions foreclose Osborne's right to obtain post-conviction access to evidence. The same rule that allows us to consider the probative value of the confessions requires that we do so in light of exculpatory DNA tests and all the rest of the new and old evidence in this case. Thus, the question before us is not how much weight we should afford Osborne's confessions standing alone, but how they might be squared with exculpatory DNA tests and the remainder of the evidentiary record. *See Godschalk v. Montgomery County Dist. Attorney's Office,* 177 F.Supp.2d 366, 370

(E.D.Pa.2001) ("While plaintiff's detailed confessions to the rapes are powerful inculpatory evidence, so to any DNA testing that would exclude plaintiff as the source of the genetic material taken from the victims would be powerful exculpatory evidence."). As we have already discussed, further DNA testing will be highly probative of Osborne's guilt or innocence given the facts as we know them. We can therefore expect to see one of two possible scenarios unfold: Either the confessions will be proven accurate by test results proving Osborne was in fact the passenger-rapist and his case will proceed no further, or the test results will exclude him as the source of the biological material, in which case serious questions will be raised about the validity of his confessions and whether, as Osborne now claims, he was motivated to confess falsely as the most expeditious means available to obtain release from prison. *Cf. Baylor v. Estelle,* 94 F.3d 1321, 1323–25 (9th Cir.1996) (holding that despite the defendant's confession, trial counsel's ineffective assistance in failing to follow up on potentially exculpatory semen evidence in a sexual assault case was prejudicial because evidence excluding the defendant as the semen donor "would necessarily have raised reasonable doubt about the validity of his confession").

Accordingly, we decline to hold that Osborne's confession during parole proceedings necessarily trumps the materiality of physical evidence or the right to obtain post-conviction access to evidence. Such a rule would ignore the emerging reality of wrongful convictions based on false confessions and the capability of DNA testing to reveal the objective truth and exonerate the innocent.

### D

■ The State finally contends that the district court erred in finding that

further DNA testing "can be easily performed without cost or prejudice to the [State]." *Osborne*, 445 F.Supp.2d at 1081. In the State's view, prejudice is inherent in the granting of post-conviction access to evidence because it erodes the important value of finality in the criminal justice system. We disagree.

Although finality is undoubtedly an important consideration, it is not such an immovable force as to override the due process interests presently at stake. If Osborne already had in hand the exculpatory evidence he seeks and filed a habeas petition stating a valid claim for relief, there would be no question that his petition must be heard despite finality considerations. "The federal writ of habeas corpus overrides all [such] considerations, essential as they are to the rule of law, when a petitioner raises a meritorious constitutional claim in a proper manner in a habeas petition." *McCleskey v. Zant*, 499 U.S. 467, 492–93, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Even a procedural default would not necessarily foreclose Osborne's claim given the availability of a *Schlup* gateway claim of actual innocence. *See, e.g., Thomas*, 979 F.2d at 749. Though no doubt eroding finality, such an exception "serves as 'an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty,' guaranteeing that the ends of justice will be served in full." *McCleskey*, 499 U.S. at 495, 111 S.Ct. 1454 (quoting *Stone v. Powell*, 428 U.S. 465, 491–92 n. 31, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)).

The State's conception of finality would reverse these priorities. The evidence in question can be produced easily and without cost to the State and, if favorable to Osborne, would be strong evidence in support of post-conviction relief. Nonetheless, the State seeks to foreclose such relief by its simple refusal to open the evidence locker. We rejected a similar tactic in *Thomas*, 979 F.2d at 749–50, and we reject it again here.

The State supports its position with the argument that the circumstantial and eyewitness evidence in this case is also strong evidence of Osborne's guilt, and thus granting access is not likely to "further the truth seeking function of our criminal justice system." As recent history has shown, however, DNA evidence has the capability of refuting otherwise irrefutable inculpatory evidence, and as we have already established this case is no exception.

If the inculpatory evidence has been correctly interpreted, further DNA testing will confirm that Osborne is guilty as charged and convicted. But it remains a very real possibility that further DNA testing will be exculpatory and may even lead to Osborne's exoneration. In the former case, the State will have lost nothing; indeed, it will gain even more definitive proof of Osborne's guilt and will be relieved of the burden of further post-conviction litigation. In the latter case, however, Osborne will obviously gain a great deal, as will the State, whose paramount interests are in seeking justice, not obtaining convictions at all costs, and which will then have strong evidence for use in catching and punishing the real perpetrator. Importantly, the State is prejudiced in neither case, and the truth-seeking function of the criminal justice system is furthered in either case.

**V**

In *Thomas*, we granted a prisoner's request for post-conviction DNA testing to establish a gateway claim of actual innocence "[i]n light of the obvious exculpatory potential of semen evidence in a sexual assault case." 979 F.2d at 750 n. 2. This sexual assault case is no exception. We therefore agree with the district court and hold that Osborne's right to due process of

law prohibits the State from denying him reasonable access to biological evidence for the purpose of further DNA testing, where that biological evidence was used to secure his conviction, the DNA testing is to be conducted using methods that were unavailable at the time of trial and are far more precise than the methods that were then available, such methods are capable of conclusively determining whether Osborne is the source of the genetic material, the testing can be conducted without cost or prejudice to the State, and the evidence is material to available forms of post-conviction relief.[4]

In so holding, however, we do not purport to set the standards by which all future cases must be judged. We are presented with a certain set of circumstances presenting a meritorious case for disclosure, and our analysis and holding are addressed to those circumstances only. Despite the manner in which the parties have presented the issues, such questions as whether the scope of the right of post-conviction access should be broader or flexible to accommodate different circumstances, whether the materiality standard for post-conviction access-to-evidence claims should be less stringent or defined in a different manner, and whether prisoners with a less compelling case might also be entitled to post-conviction access, all are questions that we need not answer and do not purport to answer in deciding this case. We leave them for another day.

**AFFIRMED.**

---

**4.** Given our holding, we need not reach Osborne's alternative arguments that the State's denial of access to potentially exculpatory DNA evidence is effectively a denial of meaningful access to courts in violation of the First and Fourteenth Amendments, *see Christopher* *v. Harbury*, 536 U.S. 403, 412–22, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), or that it violates his due process right to effectively pursue parole and executive clemency, *see Harvey II*, 285 F.3d at 320 (Luttig, J., respecting the denial of rehearing en banc).